UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| KATHY CHINOUTH, ROBERT CHINOUTH, and PEKIN INSURANCE CO., <br><br> Plaintiffs, <br><br> v. <br><br> MJC AMERICA, LTD., GREE USA, INC.; HONG KONG GREE ELECTRIC APPLIANCE SALES, LTD.; and GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, <br><br> Defendants. | No. 3:24 C 50323 <br><br> Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

On August 9, 2022, the home of Cathy and Robert Chinouth caught fire, causing significant damage. The Chinouths' homeowners' insurer, Pekin Insurance Company ("Pekin"), paid the Chinouths' substantial claim for the loss. The Chinouths and Pekin then filed this products liability lawsuit, alleging that a defective dehumidifier manufactured by Defendants caused the house fire. Plaintiffs seek compensatory and punitive damages. Defendants contest the propriety of such an award and argue that, if punitive damages are available at all, they must be assessed based solely on the Chinouths' out-of-pocket losses—that is, the value of their deductible. Plaintiffs object to this proposed limit and move the court for a ruling that an award of punitive damages should be based on the total loss caused by the alleged design defect. For the reasons explained here, the court concludes Plaintiffs are correct.

**BACKGROUND**

I.    **The Gree Dehumidifier**

This case arose from a fire allegedly caused by a defective dehumidifier.[1] The particular model of dehumidifier at issue was manufactured by Defendant Gree Electric Appliances of Zhuhai ("Gree"), a Chinese appliances manufacturer, and was sold by Gree's subsidiaries in the United States. (Compl. [1] ¶¶ 14–16; 88.) Gree marketed and distributed the model under several brand names, including Frigidaire, GE, Gree, Kenmore, and Soleus Air. (*Id.* ¶ 83.)

According to Plaintiffs, this dehumidifier model contained a number of defects that made it especially prone to fire. Specifically, they allege that the design "failed to use fire retardant plastic for the dehumidifier bodies"; "used conductor insulation that contained plasticizer that leeched out" at foreseeably high temperatures; and "located the thermal overload protecter in proximity to the plasticizer-leaching conductor insulation." (*Id.* ¶ 94.) As a result of the defective design, Plaintiffs allege, this dehumidifier model has caused "more than 2,000 incidents . . . including 450 fires and more than $19,000,000 in property damage." (*Id.* ¶ 74.)

Plaintiffs allege that the Chinouths purchased one of the defective dehumidifiers and that on August 9, 2022, it "spontaneously combusted," causing a fire at their home in Lena, Illinois. (*Id.* ¶¶ 88–91.) Defendants acknowledge that the fire occurred, but dispute that it was caused by the humidifier. (Defs. Resp. to Pl. LR 56.1(a)(2) SOF [59] ¶ 1.)

Plaintiffs further allege that Defendants knew of the dehumidifier's fire risk but failed to take adequate steps to address it. Instead, the complaint alleges, Defendants deliberately made false statements to Underwriters Laboratories ("UL"), an organization that certifies consumer products as meeting minimum fire safety standards. (Compl. [1] ¶¶ 17–24.) Later, after Defendants became aware that their products were causing fires, they violated federal law by

---

[1] Both parties complied with Local Rule 56.1; these submissions, however, are only three paragraphs long, and provide little detail about the factual background of this case. (*See generally* Defs. Resp. to Pl. LR 56.1(a)(2) SOF [59].) To provide context for the reader, the court recounts allegations in Plaintiffs' Complaint [1].

failing to promptly report the information to the Consumer Product Safety Commission ("CPSC"). In March 2016, after the CPSC uncovered Defendants' failure to report, the CPSC levied a civil penalty of around $15 million. (*Id.* ¶ 83.) The U.S. Department of Justice later opened a criminal investigation, accusing Defendants of willful failure to report information regarding consumer products, in violation of 15 U.S.C. §§ 2060(a)(4), 2070. In a criminal information filed in the Central District of California, the government charged that Defendants Gree Electric Appliances, Hong Kong Gree Electric Appliances Sales, and Gree USA, "obtained information which reasonably supported the conclusion that dehumidifiers manufactured, distributed, and sold in interstate commerce by the defendants contained a defect that caused those dehumidifiers to overheat and catch fire," but that defendants "knowingly and willfully failed" to report the defect to the CPSC. (Information [1-2] at 2–4.)[2] The charged Gree entities pleaded guilty on October 28, 2021, ten months before the Chinouths' fire. (Compl. [1] ¶ 85.)

## II. Assignment Agreements

Under the terms of the Chinouths' insurance policy, Pekin's payment of the claim entitles Pekin to pursue a subrogation claim against the tortfeasor for the value of the claim. The relevant provision of the insurance policy states as follows:

> **Subrogation**. An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us. If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

(Chinouth Decl. [20] at 31.) Under this provision, Pekin's payment of the Chinouths' claim entitled Pekin to demand an assignment of the Chinouths' right to recover compensatory damages from a tortfeasor, up to the value of the claim paid. (*See id*, Pls. Br. [49] at 2.) On July 30, 2024, the Chinouths and Pekin jointly filed this action, seeking both compensatory and punitive damages. (*See* Compl. [1].) Defendants moved to dismiss on October 4, 2024, noting that, as drafted, the

---

[2] It is not clear why Defendant MJC America, Ltd., was not named in the information.

3

complaint purported to seek punitive damages on behalf of Pekin; Defendants argued that Pekin's subrogation claim is limited by law to "a maximum recovery of amounts paid to its insured," meaning that the company is not entitled to recovery of punitive damages. (See Mot. to Dismiss [12] at 4.)

Plaintiffs initially pushed back. In their October 16, 2024 response, Pekin and the Chinouths (jointly represented by Attorney Ron Harmeyer) argued that "Illinois law unquestionably allows an insured to assign the right to pursue punitive damages to a third-party." (Opp'n to Mot. to Dismiss [19] at 2.) Plaintiffs provided a copy of document signed by the Chinouths on October 14, 2024 (referred to here as "the First Assignment Agreement"), in which the Chinouths appeared to assign not just what was required under the subrogation provision quoted earlier, but instead their entire claim, including punitive damages, to Pekin. (First Assignment Agreement [20] at 4.) The relevant provision of the contract stated:

> Now, therefore, in exchange for the consideration of payments made by Pekin, Robert and Kathy Chinouth hereby assign to Pekin Insurance all rights, claims, and causes of action, *expressly including but not limited to claims for punitive damages*, that they may have against any and all other parties, arising from the August 9, 2022, fire that occurred at their house[.]

(*Id.* (emphasis added).) It was not clear that the Chinouths received anything in exchange for assigning the full value of their claim. When the court questioned Attorney Harmeyer (who drafted the agreement) about this, he explained that "the Chinouths are relieved of [litigation] risk if they assign their rights to Pekin" (Nov. 7, 2024, Hearing Tr. [24] at 9:18–9:23)—an unsatisfying explanation because the Chinouths had no obligation to file a lawsuit at all. The court concluded the agreement invalid for lack of consideration and granted Defendants' motion to dismiss any claim to punitive damages on the part of Pekin, noting that "it is the individual Plaintiffs (the Chinouths), not their insurer (Pekin), who are entitled to recover[y] of any punitive damages award." (Minute Order [23].)

On July 7, 2025, Attorney Harmeyer reported that his clients had entered into a second agreement (the "Second Assignment Agreement"), one that was effectively the reverse of the first:

4

In this Second Assignment Agreement, Pekin relinquished its right to directly recover any damages from Defendants, and instead simply claimed a lien on any compensatory damages awarded to the Chinouths, up to the amounts Pekin had paid the Chinouths for their loss.[3] The Acknowledgement of Lien agreement reads as follows:

> 2. [The Chinouths] will reimburse Pekin up to the amount of its lien from any recovery they obtain from any third-party subject to the following conditions:
>    a. Such payment will be made only after the Chinouths are made whole of any compensatory damages they suffered; and
>    b. Such payment will be made only from the recovery of compensatory damages, and not from any award of punitive damages.

(Acknowledgement of Lien [52] at 4.) In his brief to the court, Harmeyer claims the Second Assignment Contract was designed to address "the Court's expression of its concerns, and to clarify the record moving forward." (Pls. Br. [49] at 2.) And, in response to the questions at oral argument, Attorney Harmeyer assured the court that the Chinouths were not disadvantaged by this arrangement: He stated that, if the Chinouths prevail in this lawsuit, any recoverable attorneys' fees will be paid by the Chinouths and their insurer on a pro rata basis; that the Chinouths alone would have input on any proposed settlement; and that Pekin could be dismissed from this lawsuit. (Oral Arg. Tr. [112] at 2:23–9:22.) In an affidavit filed after the hearing, Harmeyer also asserted that even when they entered into the First Assignment Agreement, his clients understood that if Pekin remained involved in the lawsuit, only the Chinouths were entitled to any award beyond the amounts that Pekin had paid on their claim. (Harmeyer Aff. [111-2] ¶¶ 9, 11.) The Chinouths themselves and Pekin employee Diane Schurman have confirmed in

---

[3] Defendants suspect that this agreement is invalid due to "concerns regarding the propriety of prior contractual agreements between Mr. Harmeyer's plaintiffs." (Opp'n [57] at 15.) They also complain that they have not been able to adequately brief the validity of the Second Assignment Agreement because it was "only disclosed to Defendants in the instant motion and radically alter[s] Plaintiffs' theory of recovery related to punitive damages." (*Id.* at 14.) Because, as explained below, this argument is ultimately immaterial to the recovery of punitive damages in this case, the court declines to consider the matter at this time, but Defendants are free to challenge the Second Assignment Agreement on these grounds, if appropriate, at a later point.

affidavits that this was indeed their understanding. (*See* Chinouth Aff. [111-1] ¶¶ 10–12; Schurman Aff. [111-3] ¶¶ 19–23.)[4]

With this issue clarified, the court turns to the merits of Plaintiffs' motion.

## **DISCUSSION**

In their motion for partial summary judgment, Plaintiffs ask the court to make legal determinations:

> [1] In the event the jury awards punitive damages, the reasonableness of the award will be based on the total or potential damages caused by the fire, not the uninsured damages; and
>
> [2.] While there are numerous factors to consider when evaluating the reasonableness of any potential punitive damages award, there is no fixed ratio cap.

(Pls. Br. [48] at 1.) As explained below, the court agrees with Plaintiffs on both of these issues and will so instruct the jury.

### I. **Reasonableness of Punitive Damages**

The Supreme Court has long held that "grossly excessive" punitive damages awards constitute "an arbitrary deprivation of property" and violate the Due Process Clause of the Constitution. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). The Court has not set a bright-line test for when awards are "grossly excessive." *See, e.g.*, *BMW of North Am. v. Gore*, 517 U.S. 559, 585–86 (1996). But it has commented that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.

---

[4] The court notes that this purported understanding does not appear in the language of the First Assignment Agreement itself, which refers to an assignment of all of the Chinouths' rights, "expressly including but not limited to claims for punitive damages." (First Assignment Agreement [20] at 4.) Nor is it clear why, if his clients understood all along that any punitive damages belonged to the Chinouths, Mr. Harmeyer did not say so in response to Defendants' earlier motion to dismiss Pekin's punitive damages claim. The court is satisfied that the Second Assignment Agreement is consistent with the terms of the Chinouth/Pekin insurance agreement, however, and declines to comment on the matter further at this stage.

The parties' core disagreement concerns the method of determining the propriety of an award of punitive damages. All agree that an excessively high ratio between punitive damages and the amount of "harm, or potential harm," violates the Due Process Clause. *Id.* at 424–25. But the parties disagree on how to calculate "harm." Plaintiffs believe that "harm" refers to the total value of the property damage caused by the fire, as determined by the jury at trial. (Pls. Br. [49] at 11.) Defendants see things differently: they argue that "harm" refers solely to the amount of compensatory damages awarded *to the party seeking punitive damages* (here, the Chinouths) at trial. (Defs. Opp'n [57] at 11–12.) At first glance, this would not appear to impact the ultimate punitive damages award, because the Second Assignment Agreement gives the Chinouths the ability to pursue the full value of the claim. But Defendants further argue that the assignment contract was invalid, and that subrogation must be imposed, meaning (as Defendants see things) that the Chinouths' compensatory damages are limited to their uninsured loss (their $2,500 deductible), and that this deductible amount must be the basis for any award of punitive damages.

The court turns first to Defendants' challenge to the validity of the assignment. In insurance law, under the so-called "collateral source doctrine," payments made by a third-party insurance company do not bar the insured party from recovering compensatory damages against the tortfeasor. *Wills v. Foster*, 229 Ill. 2d 393, 415, 323 Ill. Dec. 26, 39, 892 N.E. 2d 1018, 1031 (Ill. 2008). There is an exception when claims are subrogated: "'Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant.'" *Trogub v. Robinson*, 366 Ill. App. 3d 838, 842, 304 Ill. Dec. 527, 531, 853 N.E.2d 59, 63 (1st. Dist. 2006) (quoting DAN B. DOBBS, LAW OF REMEDIES § 4.3(4), at 604 (2d ed. 1993)). Many insurance policies expressly allow the insurer to pursue compensatory damages from the tortfeasor, in the shoes of the insured, whenever the insurer pays a claim resulting from the tort—this is called "conventional or contractual subrogation." *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 626 (7th Cir. 2001). Even when the insurance policy is silent on subrogation, the courts will

7

occasionally impose "equitable subrogation" to prevent unjust enrichment. *Wilder Corp. of Del. v. Thompson Drainage & Levee Dist.*, 658 F.3d 802, 807 (7th Cir. 2011). Whether subrogation is express or implied, whenever a party's "rights against the wrongdoer have been subrogated to an indemnitor," the collateral source rule does not apply—in such cases, the subrogee and subrogor cannot both seek compensatory damages based on the same underlying tort. *Austin Co. v. International Brotherhood of Electrical Workers, Local Union No. 701*, 665 F. Supp. 614, 620–21 (N.D. Ill. 1987) (citing *Carter v. Berger*, 777 F.2d 1173, 1175 (7th Cir.1985)). Applied here, this means that Pekin and the Chinouths cannot simultaneously sue Defendants for the same set of compensatory damages. Only one may recover.

Defendants correctly point out that the Chinouths' insurance policy gives Pekin the option to "require an assignment of rights of recovery for a loss to the extent that payment is made by us." (Opp'n [57] at 7.) But Defendants then take the argument a step too far: they argue that Pekin "perfected its subrogation interest by filing the lawsuit," and thus cannot relinquish its subrogated claim or assign it back to the Chinouths. (*Id.*) In their view, the Second Assignment Agreement is invalid for this reason.

The court is not convinced. The insurance policy in this case does not mandate subrogation—it merely gives Pekin the option to require the Chinouths to assign a portion of their claim. As explained earlier, the court concludes that the First Assignment Agreement was invalid, meaning that Pekin has no subrogated interest by virtue of that agreement. *Am. Fam. Mut. Ins. Co. v. N. Heritage Builders, L.L.C.*, 404 Ill. App. 3d 584, 588–89, 937 N.E.2d 323, 327, 344 Ill. Dec. 617, 621 (1st Dist. 2010) (explaining that a subrogation action cannot proceed when an insurance company does not execute its option by demanding an assignment from the insured). And even if Pekin somehow implicitly exercised its option by filing this lawsuit, it is clear that Pekin is no longer claiming any such right. Defendants cite no authorities supporting their apparent view that subrogation is permanent and irreversible once a lawsuit has been filed. Likewise, because the parties' contracts expressly deal with the issue of subrogation, the court sees no

reason to impose equitable subrogation.[5] *Benge v. State Farm Mut. Auto. Ins. Co.*, 297 Ill. App. 3d 1062, 1071, 232 Ill. Dec. 172, 178, 697 N.E.2d 914, 920 (1st Dist. 1998) ("Where the right is created by an enforceable subrogation clause in a contract, the contract terms, rather than common law or equitable principles, control.").

In any event, the court concludes that this issue is not material to the size of any punitive damages award. Even assuming *arguendo* that the Second Assignment Agreement is invalid (and subrogation is permanent), the court nonetheless agrees with Plaintiffs that the reasonableness of any punitive damages must be assessed based on "actual harm inflicted on the plaintiff," *Gore*, 517 U.S. at 580, not simply uninsured loss. As the Supreme Court has explained, "[e]lementary notions of fairness" inherent in the Due Process Clause require that punitive awards be proportional, to some extent, to the defendant's wrongdoing. *Id.* at 574. Because punitive damages are intended to "punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct," their reasonableness is assessed by analyzing the *wrongfulness* of the defendant's underlying actions and the damage caused by them. *Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996) (citing *Memphis Comm. Sch. Dist. v. Stachurra*, 477 U.S. 229, 307 n.9 (1986)). The plaintiff's insurance coverage is not relevant to this determination. Punitive damages are intended to punish the defendant, not reimburse the plaintiff, so it would make little sense to let a tortfeasor off the hook simply because the plaintiff was insured.[6]

---

[5] This makes sense particularly here, where the party seeking to enforce subrogation is neither the insured or insurer, but instead a third-party tortfeasor attempting to reduce its legal exposure. *See Mut. Serv.*, 265 F.3d at 626 (explaining that equitable subrogation is subject to the doctrine of superior equities, which is the principle that one cannot invoke "the right of subrogation when the party against whom he seeks to exercise it has equities equal to or superior to his own").

[6] And, because homeowners' insurance coverage is nearly universal, the natural extension of Defendants' argument is that punitive damages are essentially unavailable in cases involving property damage. That is clearly not the law.

Further, Supreme Court jurisprudence on this point assesses the constitutionality of punitive damages awards based exclusively on the defendants' conduct. In *BMW of North America, Inc., v. Gore*, 517 U.S. 559, 574–75 (1996), for example, the Court articulated three "guideposts" that are relevant to determining the constitutionality of punitive damages: (1) "the degree of reprehensibility of the defendant's misconduct"; (2) "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award"; and (3) "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575). Each of these three factors focus on the wrongfulness of the defendants' conduct, and none concern the insurance coverage of the plaintiff.

True, as part of this second guidepost, the Supreme Court does direct lower courts to consider the ratio between compensatory and punitive damages. *Gore*, 517 U.S. at 580–81. But the use of compensatory damages in this ratio is helpful only for assessing the figure that truly matters, which is the actual harm done by the defendant. *Id.* at 580 (referring to a ratio between punitive damages and "actual harm inflicted on the plaintiff"); *see also Sommerfield v. Knasiak*, 967 F.3d 617, 624 (7th Cir. 2020) (finding that a jury's award of "punitive damages without compensatory damages" was "not suspect"). Whenever compensatory damages differ from the actual harm as determined by the jury at trial, it is the actual harm that is used to determine the reasonableness of punitive damages. *See, e.g.*, *SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929 (11th Cir. 2020) ("The appropriate ratio, therefore, is not based on a comparison of compensatory damages to the punitive damages award, but on harm likely to occur or that has actually occurred."). Defendants' belief otherwise is erroneous.

Indeed, the Supreme Court has explicitly rejected the mechanical focus that Defendants now advance. In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 425 (2003), the Court notes that focusing on the dollar value of compensatory damages is misguided, as "a particularly egregious act [that] has resulted in only a small amount of economic damages"

10

might warrant a higher recovery. In other words, the core question here is one of fairness and proportionality—whether the "punishment" of punitive damages fits the "crime" of the underlying tort. Ratios are a key part of answering this question, but Defendants' focus on the technical allocation of compensatory damages between Pekin and the Chinouths muddies the waters and obscures the core constitutional issue. *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676–78 (7th Cir. 2003) (explaining that ratios are simply one factor among many in determining whether a punitive damages award is constitutional).

Defendants' position is also inconsistent with public policy. As another court has observed, in a case involving the same dehumidifier (and the same attorneys), Defendants' argument "amounts to a contention that tortfeasors are largely, if not totally, exempt from punitive damages when a victim was compensated by her insurer." *Reynolds v. MJC America, Ltd.,* No. 23 C 738, 2025 WL 659390 *5 (E.D. Wis. Feb. 28, 2025). This is "radically inconsistent with the public policy underlying punitive damages," *see id.*, and would unfairly penalize plaintiffs for purchasing insurance. And, conversely, it would allow tortfeasors to be shielded from the full consequences of their actions by insurance coverage paid for by their victims—a result that would nullify the effect of damages in areas of tort law (like property damage) where insurance coverage is the norm. *Id*. Defendants take no account of these consequences of their argument.

Defendants counter that because "Pekin is subrogated to the Chinouths' recovery to the extent of its payments, the collateral source rule does not apply." (Defs. Opp'n [57] at 10.) But Defendants do not explain how this general rule restricts the Chinouths' recovery of punitive damages. True, the Chinouths and Pekin cannot both pursue recovery for the same set of *compensatory* damages; but *punitive* damages cannot be pursued by a subrogee, so the subrogation exception to the collateral source rule has no impact on the Chinouths' pursuit of punitive damages.[7] *See Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 729 (N.D. Ill. 2014)

---

[7] "The general rule is that a subrogee is entitled to indemnity to the extent only of the money actually paid by the subrogee to discharge the obligation or the value of the property

11

("Under Illinois law, an action by a subrogee/insurance company is one of indemnification, and thus the insurance company as subrogee is limited to reimbursement for what it paid its insured and no more.").

Finally, Defendants argue that allowing punitive damages in this case would constitute a repetitive punishment, given that they have already paid large civil and criminal penalties to the government for their actions in this matter. (Opp'n [57] at 12–14.) It is true that penalties levied in parallel proceedings arising out of the same conduct can factor into whether a punitive damages award is excessive. *See Hazelwood v. Illinois Cent. Gulf R.R.*, 114 Ill. App. 3d 703, 450 N.E.2d 1199, 71 Ill. Dec. 320 (1st Dist. 1983) (courts consider, among other factors, whether "the defendant faces multiple liability for the same or similar wrongs"); *State Farm*, 538 U.S. at 428 ("We note that, in the past, we have also looked to criminal penalties that could be imposed."). But the court cannot analyze the reasonableness of a punitive damages award that does not yet exist. If Defendants feel the jury's award is unfair in light of penalties in parallel matters, they will be free to make such an argument in an appropriate post-trial motion.

For these reasons, the court concludes that punitive damages are assessed by the actual harm, as determined by the jury at trial.

## II. Fixed Ratio Cap

Finally, Plaintiffs seek a ruling that "there is no fixed ratio cap" when weighing the reasonableness of punitive damages. This matter requires only brief discussion, as Defendants do not contest it. (Opp'n [57] at 11 (acknowledging that there "is no bright-line ratio between compensatory and punitive damages").) Nor could they, as the Supreme Court explicitly answered the question in *Gore*, explaining there that it has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." 517 U.S. at 582. The Court reiterated this holding

---

applied for that purpose. Thus, a subrogee cannot sue for punitive damages." *See* 73 Am. Jur. 2d *Subrogation* § 66 (2025).

in *State Farm*, where it "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. at 424–25. Many other courts in Illinois and the Seventh Circuit have reached the same conclusion. *See, e.g.*, *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd*., 980 F.3d 1117, 1143 (7th Cir. 2020) ("In conducting this analysis, the Supreme Court has declined to set a fixed ratio limiting punitive damages."); *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co*., 225 Ill. 2d 456, 486, 870 N.E.2d 303, 321, 312 Ill. Dec. 238, 256 (Ill. 2006) ("The [U.S.] Supreme Court has consistently rejected the notion that the constitutional line is marked by a simple mathematical formula and has declined to impose a bright-line ratio which a punitive damages award cannot exceed." (citations and internal quotation marks omitted)).

## CONCLUSION

The motion for partial summary judgment [48] is granted in that the court confirms that the reasonableness of any punitive damages award will be based on total damages resulting the incident giving rise to this lawsuit (not the uninsured portion alone), and that there is no fixed ratio cap for such an award. At trial, the jury will be instructed on punitive damages in accordance with this opinion.

ENTER:

Dated: February 3, 2026

REBECCA R. PALLMEYER
United States District Judge